JENNIE E. WILSON, Admx., *vs.* N. Y., N. H. & H. R. R. Co.

APRIL 20, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Master and Servant. Common Carrier. Maintaining dangerous obstruction near Rails.*

In an action to recover for death of a brakeman, caused, as alleged, by negligence of defendant in permitting a post to remain in close proximity to its tracks, whereby intestate was struck and killed while on a car, evidence considered, and held to sustain finding that defendant was guilty of negligence in maintaining post where it was.

(2) *Master and Servant. Common Carrier. Due Care.*

Although the law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons, yet, to justify such exposure for the purpose of saving life, it is necessary that there should be imminent danger to the person sought to be saved, and that the method be not rash or reckless in the judgment of prudent persons; so, therefore, where, in the case at bar, children were holding on to the rods of the side of

a freight train, running at from seven to thirteen miles an hour, and intestate, a brakeman, went down the end of a car, and, without looking ahead, stepped into the stirrup with his back toward the way the train was going and leaned outward and waived his hand to frighten away the children hanging on to the cars in the rear, no such exigency is shown as would justify the act which resulted in the death of intestate, no justification appearing from any directions to brakeman to act as intestate was doing. The verdict is held to be against the evidence on the question of due care.

(3)  *Master and Servant.    Evidence.    Rules of Road.*

In an action against a common carrier, for death of brakeman while trying to drive away children from a moving train, rules of defendant, offered by plaintiff, containing instructions to conductors as to permitting persons to ride on freight trains, directions to brakemen as to their duties, etc., directions to attend to the instructions of the conductor, etc., were properly admitted.

(4)  *Master and Servant.    Evidence.    Rules of Road.*

Rule as to trespassers on right of way, *held*, improperly admitted in such action, when offered by plaintiff, since not applicable to the state of facts.

(5)  *Evidence.    Customary Usage.*

While evidence of customary usage among well-managed railroads is properly admitted, as tending to show due care on the part of defendant in the matter alleged as negligence, such evidence can not be regarded as conclusive, and plaintiff was properly allowed to cross-examine as to the safety of the construction shown by such testimony.

(6)  *Evidence.*

Where an expert on part of defendant had testified, in direct examination, to the distance from the rail at which another railroad endeavored to place objects beside the track, and had said it was common practice to have objects at a less distance, question as to the minimum distance from the rail, in the year of the accident of an object similar to the one described in the testimony, was improperly excluded.

(7)  *Master and Servant.    Railroads.    Duty to Employees.*

The duty of a railroad company is to make its structures and appliances reasonably safe for its employees; so, if a post was located too near the track to be reasonably safe for brakemen properly discharging their duties on passing freight trains, the company would be liable to an employee injured in the proper discharge of his duty, unless he knew of the danger or had competent means of knowledge.

(8)  *Railroads.    Assumed Risk.    Safe Premises.*

Where a railroad company permits a post to remain so near its tracks as to expose its employees to risk of injury, while performing their duties, such risk is not one incident to the employment and assumed by the employees.

(9)  *Railroads.    Due Care.    Safe Premises.*

An instruction that if the jury found that the post was unnecessarily near to

the track, that intestate was absorbed in the performance of his duties, and his attention was thereby diverted from the danger to which he was exposed, and he was ignorant of the existence of the post, and had no competent means of knowing of its existence, it was for the jury to decide whether plaintiff might recover, was an incomplete statement of the law, since it omitted all reference to the obligation of care proportioned to the circumstances of the case.

(10)   *Master and Servant.   Negligence.   Common Practice.*

On the question of common practice of railroads, in regard to the facts alleged as negligence, a request to charge that common practice does not mean universal practice, or that a certain practice was more prevalent than another, but merely that that was done right along, was properly refused, since it omits all qualifications as to common practice by reasonably careful and prudent men.

(11)   *Master and Servant.   Safe Premises.   Notice to Servant of Risk.*

If the exigencies of the situation are such as to make it necessary for a railroad company to locate the tracks so near a post as to be a source of danger to employees in the performance of their duty, it is the duty of the company to notify such employees of that fact.

(12)   *Master and Servant.   Express Agreement as to Assumed Risks.*

A servant assumes the risks by entering upon the employment, and he can as lawfully assume them by written agreement as by implication.   So, where a servant in his application for employment agreed to assume the risks, and acquaint himself with the surrounding objects, the court should have left to the jury to say whether the servant had reasonably complied with his agreement, so to do.

TRESPASS ON THE CASE for negligence.   Heard on exceptions of defendant, and exception to decision of Superior Court denying its motion for a new trial on the ground that verdict was against the evidence, with other exceptions; sustained, and new trial granted.

JOHNSON, J.   This is an action of the case brought by Jennie E. Wilson, as administratrix of the estate of Walter Wilson, to recover damages under the statute, for the death of her intestate, through the alleged negligence of the defendant.

On October 27th, 1902, Walter Wilson was the middle brakeman on one of the defendant's freight trains which left the West Exchange street yard in Providence at 6:55 A. M., for Pascoag.   As the train, going at a rate of speed estimated at from seven to thirteen miles an hour, neared the Acorn street

crossing, Walter Wilson noticed several children running along-
side the train, some hanging onto the brace rods, and others
hanging onto other parts of the cars. After he and another
brakeman had tried to drive them off, by shouting and trying to
scare them, without success, Wilson climbed down the ladder at
the front end of the seventh car, the ladder being on the end,
and not on the side, of the car, and when two or three steps
from the bottom he again threatened them. As they did not
desist, he descended to the bottom, put his foot in the stirrup,
which is on the outside of the car, turned his face toward the
rear of the train, the children being back of the car he was on,
waved his hand at them, and leaned outward and downward as
if about to alight. While in that position he came in contact
with an old fence-post standing beside the track, and was
thrown to the ground and sustained injuries which caused
his death.

The plaintiff's declaration was in three counts, alleging (1)
neglect of the defendant to have its roadbed and tracks in safe
and proper condition by constructing the same in close prox-
imity to a certain post on Harris avenue near Acorn street;
(2) neglect to give the intestate notice or warning of the de-
fective and dangerous condition of the said place, and of the
danger; (3) negligence in erecting, suffering, and permitting
to be maintained near said tracks a post in close proximity to
freight cars.

At the trial in the Superior Court the jury returned a verdict
for the plaintiff for the sum of five thousand dollars damages.
Thereupon the defendant duly filed a motion for a new trial,
alleging as grounds therefor:

1. The verdict is against the law.

2. The verdict is against the evidence and the weight
thereof.

3. The verdict is against the law and the evidence and the
weight thereof.

4. The damages awarded in said cause were grossly ex-
cessive and unjust.

5. The defendant has discovered new and material evidence
which it had not discovered at the time of the trial of said

cause, and which it could not have discovered at said time by the exercise of reasonable care.

The defendant's motion for a new trial was denied, and the case is now before this court on the defendant's bill of exceptions.

We will first consider the exception to the decision of the Superior Court denying the defendant's motion for a new trial on the ground that the verdict is against the evidence and the weight thereof.

As to the location of the post, Goff, the engineer called by the plaintiff, testified that he measured the distance of the base of the post from the outside edge of the rail, and that it was three and fifty-two one-hundredths feet, or substantially three feet six inches. Buckland, a witness for the defendant, testified that he measured the distance from the top of the post, measuring horizontally to the outside of the rail, and that it was three feet eight inches. He testified that another man held the end of the tape on the inside of the end of the post, and he went over until he stood at a point vertically over the outside of the rail, and got his measurement that way. He did not measure the distance between the base of the post and the rail. The height of the post from the ground was about four feet.

Measurements of the car, made May 31, 1906, showed that the overhang of the car from the outside of the rail to the outside of the sheathing was twenty-two and one half inches, and, measuring to the outside of the sill-step, was twenty-three and three-quarters inches. The car had no side-ladders, but the ladders were on the end. This car was eight feet nine inches wide. The stirrup hung fifteen and three-quarter inches below the car and was twenty-two and one-half inches above the top of the rail. The widest car in use in 1902 was nine feet eight inches. According to the testimony, therefore, the car on which Wilson was riding, having an overhang from the outside of the rail to the outer edge of the sill step of twenty-three and three-quarters inches, would come within eighteen and one-quarter inches of a post forty-two inches from the outside edge

of the rail; and would come within twenty and one-quarter inches of a post forty-four inches from the rail.

The testimony of nearly all the witnesses who were called in relation to the post, both for the plaintiff and for the defendant, was that the post leaned towards the track, some making it a slight leaning, some three or four inches, some six inches, and some a foot or more. If the measurement by Goff, the engineer, of forty-two inches from the base of the post to the rail, was correct, the distance between the top of the post and the side of the car would necessarily be reduced below eighteen and one-quarter inches. Byron S. Brown testified that he should judge that this post was eighteen or twenty inches from the side of a box car. Benjamin S. Holloway testified that he walked between the post and the car that night or the next; and brushed his shoulders on the post and car as he walked through. His measurement in that position, made in court, was eighteen inches. His testimony at a former trial was put in evidence, as follows: "Q. Put your arm as it was at the time you went between the post and the car. Q. That is about twenty-three inches; is that the place where it is? A. Yes; where you got your finger there." It is to be noted that the distance, twenty-three inches, was stated by counsel, and then a question as to the place followed. Holloway testified that the post was loose in the ground when he examined it.

There was evidence that Wilson worked for the defendant, as brakeman, February 8, 1902; that he had worked on this train two days in February, ten days in April, and from October 6th until October 27th, the day he was killed.

The plaintiff introduced certain rules of the defendant, viz., Rule No. 975: "Allow no person to ride on a freight train without orders from the Superintendent, except employees in discharge of their duties or persons in charge of freight requiring personal care in transit mentioned in every case on manifest." This was the last of a group of regulations entitled "Special Instructions to Freight Conductors."

Rule No. 1063, under the title "Rules for Freight Brakemen," which reads: "Be familiar with the rules and regulations of the road, especially those .pertaining to freight transportation.

Assist the conductor in his work, attend carefully to his instructions and in every way help to secure safety and regularity in the handling of the train and the merchandise transported by it."

Rule No. 1067: "While train is in motion, remain at post of duty designated by the conductor, on top of the cars—except when passing through tunnels or under low bridges—and never ride in the caboose, unless by special permission of the conductor, for a short time, during very cold or stormy weather. Always be at post, in position to repeat hand signals, and ready to apply brakes on signal, particularly when approaching stations, junctions, sidings, railroad crossings, drawbridges, and on down grades; keeping a sharp lookout for train breaking apart."

Rule No. 1072: "Observe rules for conductors, and other classes of employees, so far as they relate in any way to the proper discharge of your duties."

Rule E.: "Persons employed in any service on trains are subject to, the rules and special instructions;" and Rule F.: "Employees must render every assistance in their power in carrying out the rules and special instructions."

The plaintiff introduced testimony to show that the intestate, with other brakemen, had been given certain instructions by freight conductors in regard to driving children away from trains.

Holloway testified that he had been instructed by a number of conductors to put children off the train, and that he had seen quite a number of conductors put them off while the train was in motion. When asked if instructions were ever given by such conductors to the crew while Wilson and himself were present, he answered: "Yes, sir; he has told us many times to keep them away, and not allow them to ride on the cars." He testified that he had seen the conductor Donahue chase children away from the trains once or twice "at that point;" and also at other places, mentioning one place, Stillwater. When asked what they were doing, he answered, "They weren't children. They were grown men somewhere in the neighborhood of sixteen or seventeen years old," and when

asked what they were doing at the time, his answer was, "Riding on the cars." He testified that he received instructions with reference to these rules in regard to children and people who were around the freight trains from conductors Donahue, Helmer, McCabe, McLaughlin, Spinney, and Sergeant. In recross-examination by defendant's counsel he testified that he heard Charlie Morton tell Wilson to drive children off and to put them off moving trains; that Donahue told him (Holloway), in Wilson's presence, and he supposed he was telling Wilson at the same time, several times in three or four days, to drive children off moving trains; that it was a regular thing for Donahue to tell the men that. He then testified that Donahue told him the same thing in Wilson's presence half a dozen times at Johnston, where they were switching cars; that he said, "Get them off, get them off. . . . Keep them away from the train, and don't allow them around there. . . . Don't allow them on the trains." When called in rebuttal he testified that it was common practice for brakemen if they couldn't drive people away who were running alongside of the car, to go down the side of the car; that it was a common practice among brakeman to do as Wilson did to put children away. This witness testified that the ladder was on the side of the car, and not on the end. In this he is contradicted by all the other testimony on the subject.

The plaintiff's witness McGovern, a former freight conductor, testified that to keep children away from moving trains, he hallooed to them to get away; that sometimes he would have to get a little closer, but they got off before he got near them; that he gave orders to his brakemen with reference to driving people away, but he did not state what the orders were.

Plaintiff's witness Cady, a former conductor, testified that it was the common practice for brakemen to go down the end-ladder and swing on the side-ladder with the feet in the stirrup; that people and children frequently ran along the side of the train, and to put them away the brakeman would go down and put his hand out and motion to get away, and if they didn't get away, to go where they were, to go right down the ladder on

the car they were riding on, that this was a common practice; that brakemen were not accustomed to look ahead before doing this, as they were not supposed to meet with obstructions.

Plaintiff's witness Phillips testified that as a brakeman he used to tell children to get off; that if they were on the stirrup he would tell them to get off; that he never had occasion to put them off; that in getting on the side-ladder to get off and throw a switch, he never looked for obstructions. On cross-examination he said that if he went down to put children off he would not look ahead to see whether there was anything near the track, that the only thing that would make him look would be the children; that would take up his mind.

Plaintiff's witness Brown, a former brakeman on defendant's road, testified that if he went down the corner of a car to drive people away from the train, and swung himself so his body was outside the car and he on the stirrup when the train was in motion, he would look towards where the people were, and if they were back of him, he would be looking that way; that he never looked for objects near the track whether he was throwing switches, pulling pins, or driving children from the train, or anything of that kind; that he had known conductors Donahue and Helmer to drive children from trains; had heard Donahue give that instruction quite a number of times at Johnston, Stillwater, and Georgiaville, and had seen Donahue drive people off a moving train.

Plaintiff's witness McEndy, who had been a brakeman, and also a freight conductor, testified that he would not look ahead for obstructions when on the stirrup and holding on to the grab iron; that he wouldn't expect to find any, that he chased people away from the trains; that as conductor he gave orders to the men to do so; to keep children off, chase them off, men also. He did not state that he told the men to do this when the train was moving.

Agnew, a former freight brakeman on defendant's road, testified that he would not look ahead for obstructions. He said it was common practice to get down and make a bluff that you were going to throw something at children to drive them away from moving trains; had been on same crew with

Donahue when instructions were given to the crew with reference to children or people near the train, but did not state what the instructions were; that conductor Graus gave such instructions. Carroll, a former freight brakeman on defendant's road, testified that with the train in motion a brakeman going down the corner of a car and standing in the stirrup with his body outside the line of the car doesn't look for any obstructions; that he had no experience as to chasing children or older people away from freight trains while they were in motion.

McGoldrick, a former freight brakeman and freight conductor, testified that when a brakeman starts to go down on the end of a car that is in motion, and puts himself outside of the side of the car with his feet in the stirrup and holding on there, he didn't think it was necessary to look ahead, not the way he railroaded. When asked why not, he said: "Well, it depends whether you are on the road or in the yard." He said that on the main track, after the train is made up and on the way to the next station, he wouldn't look ahead unless there was something called his attention; that if something called his attention to the rear of the train he would naturally look to the rear. At the pier the children would get on the coal trains and knock off the coal, and the brakemen had instructions to keep them off. These instructions were carried out. Got down from the car and chased the children away when going between Providence and Auburn and going through Olneyville. Would see tramps going to get on and would hallo at them from the top of the car, and they wouldn't get off, and the brakemen would get down and they would get off. He doesn't state that this occurred when the train was in motion.

The plaintiff relies on said rules of the defendant, and the testimony of these men as to instructions from conductors, and as to the practice of brakemen, to show that plaintiff's intestate was acting within the scope of his employment, and that he was not guilty of contributory negligence in placing himself where he was when he came in contact with the post.

In direct contradiction of this testimony, John C. Donahue, the conductor on the train upon which Walter Wilson was killed, and who had been a brakeman, testified that he never

told Holloway or Wilson to put children off moving trains; that it was no part of the duty of the brakeman to put children off moving trains; that, although he had been a conductor for eleven years on this road, he had never had any trouble with children at Acorn street; that he knew of no duty the proper performance of which would require a brakeman to be on the side of the car; that it was the duty of brakemen to chase children away from the train when the train was standing still, but there was no such duty when the train was in motion; that a brakeman, before attempting to alight, should look ahead for obstructions.

Irving J. Helmer, who had been a conductor for the defendant for eight years, testified that he never instructed Holloway, or any of the other brakemen, to chase children off and away from moving trains; that he knew of no duty required of brakemen, where the train is running eight to ten miles an hour, that would bring him out on the side of a car; that before swinging out a man should look so as to prevent his body coming in contact with obstructions.

Edward McCabe, a freight conductor, who had been a brakeman for ten years on the defendant's road, testified that he never told Holloway, or any other brakeman, to put children off and drive them away from moving trains; that he did not remember that Holloway ever worked for him, but that he never gave anybody such instructions; that it was the duty of brakemen to look out for objects near the track.

Edward R. Spinney, a freight conductor, and Alexander McLaughlin, under whom Benjamin S. Holloway had worked, also testified that they had never given him any such instructions.

Michael M. Maloney, a conductor for the defendant, testified that there was no duty of a brakeman that would require him to throw his body outside of the side of the car; that it was no part of the duties of a brakeman to drive children away from or off moving trains.

Byron S. Brown, who had worked as a brakeman for the defendant, and who was placed upon the stand by the plaintiff, testified on cross-examination that he would not drive children

off a train going ten or twelve miles an hour; and that he would look ahead if he was going to jump off; would look ahead when he got his feet in the stirrup.

The rules for freight brakemen provided: "While train is in motion, remain at post of duty designated by the conductor on top of the cars—except when passing through tunnels or under low bridges."

Experts were called by the defendant as to the distance of objects from the track on other railroads. John F. Chandler testified that he is Supervisor of the Terminal Division of the Pennsylvania Railroad and "has charge of the maintenance of all tracks and bridges and everything approaching to the maintenance of way, see there are no obstructions to the safe passage of trains and everything except running trains." He testified that the allowance for clearance from the outside of the rail on the Pennsylvania Railroad System is forty-two inches. This standard he said applies to necessary objects and necessary construction or appliances for the purpose of operating the road. He further testified that said railroad has on its main line a fence three feet four inches from the track, and five feet above the top of the rail to prevent people crossing the tracks; and at one place it has a post five feet eleven inches high, three feet five inches from the outside rail, a permanent post, the post of an old fence, kept there to mark a property line.

John M. Fitzgerald, mechanical engineer for the Boston & Albany Railroad, testified in direct examination that said railroad maintained objects within forty-two inches from the outside of the rail; that the smallest clearance between the side of the car and an object on the road that he considered safe was twelve to fourteen inches. On cross-examination he testified as follows: "C. Q. 21. What standard have you of distance outside of your track which you allow for structures and obstructions? A. We endeavor to keep them 4 feet and over. C. Q. 22. 4 feet and what? A. Over. C. Q. 23. Measuring from where? A. From the gauge side of the rail. C. Q. 24. 4 feet and over, measuring from the inside of the rail? A. Yes, sir. C. Q. 25. That would be 48 inches? A. Yes, sir. C. Q. 26. How much would that be figuring

2½ or 3 inches for the width of the rail from the outside? A. That would be 45 inches figuring three inches for the rail." He then testified as follows: "C. Q. 84. Then the average plan of clearance on the Boston & Albany between objects next to the track and the side of freight cars is 19¼ inches? A. Yes, sir. C. Q. 85. Did you testify as follows at the last trial: 'Q. You would say that a post that came up to about the level of the bottom of a box car, and left a clearance of 23 inches wasn't a safe thing to leave or maintain there on the road? A. Yes, I think so.' C. Q. 86. Did you so testify? A. Yes, sir. C. Q. 87. 'Q. How much less than 23 inches would you think that space about a car where it was safe in your opinion? A. I wouldn't want to go much less than that.' Did you so testify? A. Yes, sir. C. Q. 88. 'Q. Then if I finally understand your testimony, any post that is left so as to come in the position I have described to you here along on a level of the lower edge of a box car that is less than 22 inches, you would not think it was safe for a brakeman? A. No, sir.' Did you so testify? A. Yes, sir." He said that he had changed his mind since the last trial, after making some measurements.

Frank B. Rowell testified that it was common practice on the Boston & Maine Railroad to have objects placed within forty-two inches of the track. On cross-examination he testified that there were numerous switch-stand targets that were less than three feet six inches from the outside of the rail, but that he was not sure these switches were in existence in 1902; that it is necessary to have freight houses three feet from the outside of the rail, but that in the case of signal poles that necessity does not exist, and it is well to locate a greater clearance. When asked how much greater, he answered: "As I said, our custom is four feet as a minimum." This distance he testified was measured from the outside of the rail. He testified that the majority of the switch stands were placed five feet nine inches from the outside of the rail to the center of the stand, though there were many switch stands nearer than that.

The testimony of these experts does not show uniformity of custom as to the distance of objects from the track.

Mr. Chandler testified to one post on the Pennsylvania Railroad maintained to mark a property line. The other testimony was in regard to the customary distance of objects and appliances necessary in the operation of the road. There was no testimony as to the customary distance from the rail of objects like the post in question. Evidence of customary use as to the distance from the track of necessary objects and appliances, even if shown, could not well be regarded as evidence of due care in the maintenance of an object not necessary to the operation of the road, like an old fence-post loose in the ground, and leaning towards the track, left where it was simply because it had formerly been a part of an old line fence.

(1) On the testimony we can not say that the jury were not justified in finding that the defendant was guilty of negligence in maintaining the post where it was.

It therefore becomes necessary to consider whether the plaintiff's intestate was in the exercise of due care.

The plaintiff claims that the intestate acted in accordance with instructions from the conductor and within the scope of his employment, that he was entitled to notice of the existence and position of the post, and that the danger to the children in holding on to the train and running alongside was such as to justify the intestate even in the assumption of a known risk in order to drive them away; and argues that the method adopted by him was not rash or reckless.

She cites *Keaveny* v. *Narragansett Brew. Co., Ex. No. 3366,* decided by this court. In this case the defendant had negligently permitted a certain steam valve to become badly out of repair, and a part of the boiler had broken, allowing the escape of steam into the boiler room, and the plaintiff, a fireman, in charge of the room in the absence of the engineer, operated the valve in question, and incurred the risk of personal injury in order to prevent serious damage to the property of the defendant and its workmen. It appeared from the evidence that while such apprehended damage was improbable as a matter of fact, it was fairly within the scope of the plaintiff's duty to close the valve and the plaintiff in the confusion and uncertainty of the moment was honestly impressed with the imperative

necessity of closing it.    He had reported the defect, three or four weeks before, to the chief engineer, and had been told that it would be repaired.    He supposed that the repairs had been made.    The court held that the jury did not err in finding that the plaintiff's assumption of the risk was justified by the exigency, and that the use of his hands in turning the valve was not contributory negligence.

In *Walsh* v. *Oregon Ry. & Nav. Co.*, 10 Oregon, 250, a narrow, gauge railroad had but recently been widened to standard gauge, placing the track nearer a water tank so that the window-sills of the cars in passing were variously estimated to be from six to eighteen inches from the timbers supporting the tank. Water tanks were required to be three and one-half to four feet distant from the side of the cars, and plaintiff, a brakeman, had no knowledge of the proximity of the tank in question, to the side of the cars.    In the night-time, as the train was passing the tank, the plaintiff put his head out of the window *about* eight inches because of an unusual noise, which impressed him as indicating that there was something the matter with the train, and while in that position his head came in contact with the timbers supporting the tank.    He was in the car by direction of the conductor.    He had the rules, and had read that portion requiring freight conductors to know "that a reliable brake is on the rear car, and that a brakeman is kept at it while the train is running."    There was evidence that it was usual for brakemen to look out of the window to observe the running of the train.    Upon this evidence the plaintiff was nonsuited.    The judgment was reversed, the court saying: "Whether it is usual for brakemen to look out of the car window in the course of their employment, to note the movement of the train, or whether the duty of doing so originated in the circumstances of his situation, as connected with his employment, and whether, in the performance of it, he exercised proper care and caution and conducted himself in the usual way under the circumstances, these, and other considerations of like character, not falling within the range of common observation and experience, seem to us to be more properly addressed to

the sound sense and temperate discretion of the jury under proper instructions from the court."

In *Eckert* v. *L. I. R. R. Co.*, 43 N. Y. 502, the plaintiff's intestate, seeing a little child on the track and a train swiftly approaching, so that the child would be almost instantly crushed unless an immediate effort was made to save it, thereupon, in the sudden exigency of the occasion, rushing to save the child and succeeding in that, lost his own life by being run over by the train: it was held that his voluntarily exposing himself to the danger, for the purpose of saving the child's life, was not, as matter of law, negligence on his part precluding a recovery. The court said: "The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence, which will preclude a recovery for an injury so received; but when the exposure is for the purpose of saving life, it is not wrongful, and therefore not negligent unless such as to be regarded either rash or reckless." Also *Condiff* v. *Railroad Co.*, 45 Kansas, 256.

(2)     The evidence in the case at bar, however, discloses a far different situation from any set forth in the cases cited. The only danger disclosed is such as was incident to children holding on to rods on the side of the train and running along with the train, a dangerous proceeding, and one proper to be prevented by reasonable means. The children, however, were not hanging on to the car where plaintiff's intestate went down the end and swung out and stood in the stirrup, and could not be reached by him. He could only frighten them off, at best, unless he was prepared to alight and go to them. At the time, the train, according to the testimony, was running from seven to thirteen miles an hour. The rules did not contain any directions which would justify the action taken by the intestate. They did contain the direction to "obey special instructions" of the conductor. The justification of the intestate in doing

what he did must be sought in the special instructions given
to brakemen, including Wilson, by the conductor, and acted
upon, according to some of the witnesses for the plaintiff, habit-
ually, by brakemen in the case of children holding on and run-
ning beside the train. The evidence in this regard is not satis-
factory. While there is much testimony as to general instruc-
tions to drive people and children away from trains, and some
as to instructions to drive them away from moving trains,
and as to the practice of brakemen in going down the ladder
and trying to frighten them away, there is absolutely no testi-
mony that any conductor or anyone in authority gave any
direction to brakemen to drive children away from a moving
train in the manner attempted by Wilson at the time he
came in contact with the post. It is doubtless true that the
law has so high a regard for human life that it will not impute
negligence to an effort to preserve it unless made under such
circumstances as to constitute rashness in the judgment of
prudent persons. To justify such exposure for the purpose of
saving life, however, it is necessary, first, that there be im-
minent danger to the person or persons sought to be saved, and
second, that the method attempted be not rash or reckless in
the judgment of prudent persons. In the case at bar no such
imminent danger to human life is shown. Some children were
holding on to brace rods or other parts of the cars and running
along with the train. It is shown that children frequently
did this; and while this was manifestly a far from safe proceed-
ing, it differed very materially from the danger to a child on the
track in front of a swiftly approaching train, or from the danger
a child would be in who had climbed upon the step or brace
rod, or other part of a car, and had remained there until a
speed had been attained which would render it probable that
the child would be killed if it fell off. For a brakeman to go
down the car where he could reach the child and try to save it
under such circumstances would be far different from going
down, and, without looking ahead, stepping into the stirrup
with one's back toward the way the train was going and leaning
outward and downward and waving one's hand to frighten
away children engaged in hanging to the brace rods on cars,

in the rear, and running with the train. The evidence does not show an exigency which would justify the act of the intestate which resulted in his death. In our opinion the evidence very strongly preponderates against the verdict on the question of due care on the part of the plaintiff's intestate.

The defendant excepted to the admission of Rules 975, 1063, 1067, 1072, and Rules E. and F., quoted *supra.*

(3)     These rules contained instructions to conductors as to permitting persons to ride on freight trains, directions to brakemen as to their duties and proper stations on the train, directions to attend to the instructions of the conductor, to observe rules for conductors and other classes of employees so far as they related to their duties, and stated that employees in any service are subject to the rules and special instructions. They were properly admitted.

(4)     The defendant excepted to the admission of Rule 1369, "Use every effort to keep trespassers off the right of way;" and Rule 1353, for track foremen, "See that the track on your section is examined every morning; that it is in good condition, and safe for the passage of trains." These rules were not applicable to this case. The duty of keeping trespassers off the right of way is a very different thing from driving children from a moving train; track foremen's duties would not include the removal of permanent objects maintained by a railroad company near its tracks, and the introduction of the rule would not be material for the purpose of showing notice to the defendant of the existence of a post which it was maintaining to mark a property line.

The defendant took many exceptions to the allowance of questions as to the safety of construction in regard to objects near the tracks on its road and on other railroads, in regard to which testimony was given by experts called by it. The exceptions were based (1) on the ground that customary usage among well-managed railroads is the sole test of negligence, and (2) that the questions as to safety of construction asked of its experts were not in cross-examination. The following cases are cited by defendant's counsel as supporting the contention that customary usage is the sole test: *Read* v. *N. Y.,*

*N. H. & H. R. R. Co.*, 20 R. I. 209, where the injury resulted from the breaking of a defective brake-rod. The evidence for the defendant tended to show that the flaw was not discoverable, owing to rust on the rod, by the usual methods of inspection, and the plaintiff offered no evidence to rebut this. The court said: "We will grant a new trial instead of directing judgment for the defendants, that the plaintiff may, if he can, show that the defect was not a latent defect, or that the methods of inspection employed by the defendants were not the *reasonable* and usual methods." *Burns* v. *N. Y. P &. B. R. R. Co.*, 20 R. I. 789, in which the court says: "No testimony was adduced by the plaintiff to show that it is customary for railroad companies, *or that it has ever been considered essential by prudent men engaged in the operation of railroad trains to remove spindles from the draw-bars for the purpose of inspecting them*, and in the absence of such testimony, we are of the opinion that it was not negligence for the defendant to omit an inspection of the spindle in question in that manner." *Benson* v. *N. Y., N. H. & H. R. R. Co.*, 23 R. I. 147, where the court states the rule that it is the duty of the master to provide a reasonably safe place in which to work and reasonably safe appliances and instrumentalities for the performance of the work. The court also held that a question whether cars of the construction of that on which the injury was sustained were in common use on other roads in New England was improperly excluded. This was very different from holding that such evidence, if admitted, would be conclusive. *Carr* v. *American Locomotive Works*, 26 R. I. 180, where the following charge to the jury was sustained: "That defendant is not bound to furnish the safest or newest or any particular kind of burner or burner valve except such as are in common use by *ordinarily prudent and careful men and concerns under like circumstances.*" Also *Venbuvr* v. *Lafayette Worsted Mills*, 27 R. I. 89; *Alves* v. *N. Y., N. H. & H. R. R. Co.*, 27 R. I. 581; and *McGar* v. *National & Providence Worsted Mills*, 22 R. I. 347, which are in accord with the above cases. The court in the latter case cites *Wabash Ry. Co.* v. *McDaniels*, 107 U. S. 454. In that case the court (p. 460) says: "Ordinary care, then,

.  .  .   implies the exercise of reasonable diligence and reasonable diligence implies, as between employer and employé, such watchfulness, caution, and foresight as, under all the circumstances of the particular service, a corporation controlled by careful, prudent officers ought to exercise;" and, p. 461: "And to say, as matter of law, that a railroad corporation discharged its obligation to an employé—in respect of the fitness of co-employés whose negligence has caused him to be injured—by exercising, not that degree of care which ought to have been observed, but only such as like corporations are accustomed to observe, would go far towards relieving them of all responsibility whatever for negligence in the selection and retention of incompetent servants. If the general practice of such corporations in the appointment of servants is evidence which a jury may consider in determining whether, in the particular case, the requisite degree of care was observed, such practice cannot be taken as conclusive upon the inquiry as to the care which ought to have been exercised. A degree of care ordinarily exercised in such matters may not be due, or reasonable, or proper care, and therefore not ordinary care, within the meaning of the law."

In *Texas Ry. Co.* v. *Behymer,* 189 U. S. 468, at p. 470, the court says: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."

In *Maynard* v. *Buck,* 100 Mass. 40, at p. 48, the court says: "What had been done by others previously, however uniform in mode it may be shown to have been, does not make a rule of conduct by which the jury are to be limited and governed. It is not to control the judgment of the jury, if they see that in the case under consideration it is not such conduct as a prudent man would adopt in his own affairs, or not such as a due regard to the obligations of those employed in the affairs of others would require them to adopt. It is evidence of what is proper and reasonable to be done, from which, together with all the other facts and circumstances of the case, the jury are

to determine whether the conduct in question in the case before them was proper and justifiable."

In *Austin* v. *Chicago etc. Ry. Co.*, 93 Ia. 236, the following instruction was held proper (p. 240): "The custom or practice of railroad companies in building their switches or in operating their roads, will not excuse from liability for injuries sustained, if such practice or custom is of itself negligent and disregards the safety of employes."

In *Mayhew* v. *Sullivan Mining Co.*, 76 Me. 100, p. 112, the court says: "It would be no excuse for a want of ordinary care that carelessness was universal about the matter involved, or at the place of the accident, or in the business generally. Ordinary care is the care which persons of ordinary prudence— not careless persons—would take under all the circumstances." See also *Craver* v. *Christian*, 36 Minn. 413; *Lowrimore* v. *Palmer Mfg. Co.*, 60 S. C. 153; *Geno* v. *Fall Mountain Paper Co.*, 68 Vt. 568; *Bean* v. *Oceanic Steam Nav. Co.*, 24 Fed. Rep. 124; *Carlson* v. *Wilkeson etc. Co.*, 19 Wash. 473; *Martin* v. *California C. Ry. Co.*, 94 Cal. 326; 6 Thompson Negligence, Sec. 7882.

(5)    As appears by the decisions of this court and the above cited cases, evidence of customary usage among well-managed railroads is properly admissible as tending to show due care, but such evidence can not be regarded as conclusive upon that question. As the expert testimony to customary usage was admissible as tending to show due care on the part of the defendant, it was proper that the plaintiff should be permitted to cross-examine as to the safety of the construction shown by such testimony.

The defendant excepted to questions in regard to the fence of which the post in question was formerly a part. It was admitted that the post was an old fence-post. It could not harm the defendant to show, what was already in evidence, that this post was once a part of a fence which was no longer there.

(6)    The following question, asked in the direct examination of defendant's expert, was ruled out: "What was the minimum distance from the rail in 1902, of an object similar to the one described in the testimony?" The witness had testified as to

the distance from the rail at which the Boston & Albany Railroad endeavored to place objects beside the track, and had said it was common practice to have objects at a less distance. He should have been permitted to answer the question. The exception is sustained.

We now come to the defendant's exceptions to instructions and refusals of instruction to the jury.

The plaintiff's requests follow, with the rulings thereon:

(7) "1.  If the jury find the post in question was placed and located too near the track to be reasonably safe for brakemen properly discharging their duties on passing freight trains, then it was negligence on the part of the defendant to keep and maintain the post so located, for which negligence it would be liable to an employee who was injured in the proper discharge of his duty, or to his personal representative if death ensued, unless it be shown that such employee knew of the danger therefrom or had competent means of knowledge of said danger."

This request was granted, and defendant excepted.

The instruction was correct. The duty of a railroad company is to make its structures and appliances reasonably safe for its employees,—*Darling* v. *N. Y., P. & B. R. R. Co.*, 17 R. I. 708; *Crandall* v. *N. Y., N. H. & H. R. R. Co.*, 19 R. I. 594; *Whipple* v. *same*, 19 R. I. 588.

(8) "2.  Where a railroad company suffers and permits an obstruction like the post in question to remain so near to its tracks as to expose its employees to the risk of injury therefrom while performing their duties, such risk of injury is not a risk incident to the employment, and is not a risk assumed by its employees, since the company is bound to keep its premises safe for its employees, who may properly assume that the employer is maintaining its premises and appliances in a safe condition, and for breach of this duty the railroad company would be liable."

This request was granted, and defendant excepted.

The instruction was correct. See cases *supra*, and *McGarrity* v. *N. Y., N. H. & H. R. R. Co.*, 25 R. I. 269, and *Savage* v. *R. I. Co.*, 28 R. I. 391.

"3. A railroad company is bound to exercise such care in providing safe premises for its employees as a reasonably prudent natural person would exercise under the same conditions, and it cannot avoid this duty by adopting a different standard of care even if approved by other railroad companies to the extent of becoming a common practice among railroad companies, for otherwise they might escape all liability for actually dangerous and negligent construction by simply making it a common practice to maintain such unsafe and negligent equipment, and this the law will not permit or countenance.

"If the space for clearance of obstructions commonly allowed and adopted by well-managed railroad companies is reasonably safe, then such common practice may be shown as evidence rebutting negligence, but if such space for clearance is not reasonably safe, then its adoption by other railroad companies, however extensive, does not *ipso facto* make it reasonably safe, and the mere showing of such a common practice or custom will not relieve the defendant from liability in this case if you find that the space for clearance shown here was insufficient to be reasonably safe for brakemen in the discharge of their duties, or in other words that this post was so near to the track as to be actually dangerous to brakemen in discharging their duties."

This request was granted, and defendant excepted.

The instruction was correct. See cases cited *supra* on the question of customary usage as evidence of due care.

The plaintiff's fourth request was refused.

"5. Upon the question of the contributory negligence of the plaintiff's intestate in placing himself as he did at the time of his injury, it will be your duty to consider the rules of the company, any special instructions you may find were given to him, his duty under such rules and special instructions, if any, and then to say what was a reasonable and prudent performance of such duties under all the circumstances shown by the proofs, keeping in view any efforts he may have properly made to avoid or prevent injury to others as prescribed by the rules of the company, any exigency which you may find

existed, at the time he was injured, by reason of the surroundings and the duty, if any, which he was engaged in performing at that time, and if you find that he was at the time of injury engaged in the discharge of the duty of preventing injury to others under a reasonable construction of the rules and special instructions given him, if any, and you shall further find that the method of discharging such duty did not amount to a rash or reckless act upon his part in view of all the circumstances, you would have the right to say that he was not guilty of contributory negligence, for the law has so high a regard for human life it will not impute negligence to an effort to preserve it unless made under circumstances constituting rashness in the judgment of prudent persons.

"Even where a known risk is assumed in an exigency created by imminent danger to the safety of property or the lives of others, a jury may properly find that the assumption of such known risk was justified by the exigency."

This request was granted, and defendant excepted.

The instruction was correct so far as it applies to this case. The reference to the saving of property was immaterial and caused no harm to the defendant. The point has already been covered in the discussion of the lawfulness of exposure of one's self in a proper exigency for the purpose of saving human life.

The sixth request was modified, and given as follows:

(9)    "The plaintiff's intestate had the right to assume the defendant would perform its duty in providing a safe place for him to perform his duties, and if you find that the post was unnecessarily near to the track, that he was absorbed in the performance of his duties and his attention was thereby diverted from the danger or peril to which he was exposed by reason of this post being too near the track, and Mr. Wilson was ignorant of the existence of the post and had no competent means of knowing of its existence, if such was the fact, it is for you to say under such circumstances whether the plaintiff here was entitled to recover and you would be justified in finding for the plaintiff upon such a state of facts."

The sixth instruction is an incomplete statement of the

law, inasmuch as it omitted all reference to the obligation of care proportioned to the circumstances of the case. The defendant's exception is sustained.

The defendant's requests follow, with the rulings thereon:

"1.  The defendant is bound to keep obstacles away from the track only such a distance as ordinarily careful railroad corporations do under like circumstances."

This request was refused, and defendant excepted.

The request was properly refused. The fact that a railroad only does or omits to do what other railroad companies do or omit to do, while admissible in evidence as tending to show due care, is not conclusive. The court had already instructed the jury that such testimony was proper and that they had a right to consider it, and had said: "If from the consideration of that testimony it aids you in finding what was a reasonable amount, or what reasonable prudence has fixed as a distance of clearance, why you can use it for that purpose;" and again— "You shall only give such weight to this question of common practice, as it may show what ordinary reasonable men elsewhere in the exercise of reasonable prudence and caution have seen fit to use as the distance of clearance between objects on the track and their cars." The charge in that regard was correct.

'2.  If it was common practice for ordinarily careful railroad corporations to have posts as close to the track as the post in question, the defendant was not guilty of negligence in having this post in the position in which it was, and the verdict must be for the defendant."

This request was refused, and defendant excepted.

The request was properly refused, for the same reason as the first.

"3.  The burden is upon the plaintiff to prove that the defendant was negligent in having the post in question in the position in which it was. '

This request was granted.

"4.  If the plaintiff has failed to show by a preponderance of evidence that it was not common practice for ordinarily careful railroad corporations to have posts of this kind at the

distance that this post was from the track, she has failed to prove negligence on the part of the defendant, and the verdict must be for the defendant."

This request was refused, and defendant excepted.

The request was properly refused, for the same reasons as defendant's first and second requests.

(10)   "5.   Common practice does not mean universal practice, or that a certain practice was more prevalent than another practice, but merely that that was done right along."

This request was refused, and defendant excepted.

The request was properly refused. It omits all qualifications as to common practice by reasonably careful and prudent men.

"6.   The plaintiff's intestate assumed all the ordinary risks of his employment."

This request was granted.

"7.   The plaintiff's intestate assumed all the ordinary risks of his employment whether he knew them or not, and if a post of this height, in this location, was an ordinary risk of the plaintiff's intestate's employment, it was assumed by him, and the verdict must be for the defendant."

This request was refused, and defendant excepted.

The request was properly refused. The post, if too near the track to be reasonably safe, was not an ordinary risk of the employment. *Whipple* v. *N. Y., N. H. & H. R. R. Co.*, 19 R .I. 587; *Crandall* v. *N. Y., N. H. & H. R. R. Co.*, 19 R. I. 594.

"8.   If the post in question was not an ordinary risk of the employment, and the plaintiff's intestate knew, or might have known by the exercise of reasonable care, of the location of and danger arising from the post, he assumed the risk, and the verdict must be for the defendant."

This request was granted.

"9.   The legal test of reasonable safety in appliances or places, is ordinary use, and the jury cannot set up any other."

This request was refused and defendant excepted.

The request was properly refused. It omits all qualifications as to *safe* and *prudent* use.

"10.   No man or corporation is held by law to a higher de-

gree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man.   The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual or ordinary way commonly adopted by those in the same business is a negligent way for which liability should be imposed."

This request was refused, and defendant excepted.

The request was properly refused, for the same reasons as the first.

"11.   The duty of the defendant was to furnish a place as safe and free from danger as other persons of ordinary care, prudence and caution, engaged in like business and in like circumstances, ordinarily furnish, and if the place in question was such a place, the verdict must be for the defendant."

This request was refused and defendant excepted.

The request was properly refused for the same reasons as the first.

"12.   The proper measure of damages is the pecuniary loss suffered by the parties entitled to the sum to be recovered, without any solation for distress of mind, and the loss is what the deceased would have probably earned by his intellectual or bodily labor in his business or profession during the residue of his lifetime, and which would have gone for the benefit of the persons entitled to recover under the statute taking into consideration his age, ability and disposition to labor and his habits of living and expenditure."

This request was refused and defendant excepted.

The twelfth request was properly refused.

The rules of damages in this case had been fully given to the jury in the charge.   Under our statute, in case of death, the action is considered as brought in behalf of the estate of the decedent, for the damage to that estate caused by the death in question.   *McCabe* v. *Narr. El. Lt. Co.*, 27 R. I. 272.

(11)   The defendant excepted to the following portion of the charge of the court: "If the exigencies of the situation were such as to make it necessary for them to place the track so

near the post as to be a source of danger, or to allow the post to remain so near the track as to be a source of danger, then it was their duty to notify their employees of that source of danger."

The instruction was proper. *Savage* v. *R. I. Co.*, 28 R. I. 391. In that case a conductor riding on the running-board of an electric car was struck by a pole near the track. The court said (p. 401): "The danger from this pole, if any, was either an obvious risk, and so assumed by the deceased; or else it was non-obvious, or extraordinary, and if so it was a matter as to which the deceased was entitled to special warning and instruction from the defendant. And of course it is well settled that in the latter case the burden of proof is upon the defendant to show that proper warning and instruction was given."

The defendant also excepted to that portion of the charge that: "It would make no difference if railroad companies which are said to be well regulated and operated had a less distance of clearance than you find to be reasonable; that would not excuse this railroad company."

This is simply a repetition of the former exception on the same subject.

The defendant also excepted to that portion of the charge leaving it for the jury to consider whether they found any exigency which justified the intestate in doing as he was doing at the time of the accident. This is a repetition of the former exception on the same subject.

(12) The defendant excepted also to the instruction that the agreement to acquaint himself with surrounding objects does not put a different phase upon the matter. The instruction upon that point was as follows: "And I so charge you, gentlemen, that the railroad company can not escape the effect of its own negligence by any contract or agreement that it entered into with Mr. Wilson, or any of its employees, and the relation of the railroad company to Mr. Wilson was just the same, so far as their being saved from acts of their own negligence, as if he never signed that paper. The railroad company and any other employer of labor and any other person can not be allowed to contract himself out of his own negligence. So

you may disregard that portion of this application which has been introduced in evidence." The application referred to contained the following: "If this application is granted, and I am employed as a freight brakeman, I shall enter upon such employment with a full understanding of the risks attending the same, all of which I will deliberately assume and I will, as soon as possible, make a careful examination of the railroad tracks and yards where my duty calls me, and note their condition and position and the position of all signal wires and poles, telegraph poles, switches, bridges, and other objects that are near the track."

The instruction was erroneous. The plaintiff's intestate assumed the risks of the employment by entering upon the employment, and he could as lawfully assume them by an agreement in writing as by implication. As was said by Knowlton, J., in *O'Maley* v. *South Boston Gas Light Co.*, 158 Mass. 135: "The same reason applies equally where the employee, without any express stipulation in regard to risks, enters a service which, by reason of the obvious condition of the ways, works, and machinery, involves peculiar dangers. Such a contract is implied as ought to be implied from the situation and dealings of the parties, and it has the same effect as if expressly made." He could also lawfully agree to acquaint himself with surrounding objects, as set out in the application. The court should have left to the jury the question whether he had reasonably complied with his agreement so to do. The exception is sustained.

The defendant's exception to the decision of the Superior Court denying its motion for a new trial on the ground that the verdict is against the evidence and the weight thereof is also sustained; the defendant's other exceptions are overruled, and case is remitted to the Superior Court for a new trial.

*John W. Hogan*, for plaintiff.

*Lewis A. Waterman, and Joseph C. Sweeney*, for defendant.